IN THE MATTER OF THE WILLS OF JOHN D. AND JOSEPH MILLER.

1. WILLS. *Construction.* A testator devised all his estate, real and personal, to his wife during widowhood, to hold the same to help her school and raise her children, with power to give them "their portion," or as much as might be agreed upon by her and the executors, and with power in the executors to sell or trade any of the property that they might think for the comfort and interest of the wife and children, but said nothing more in his will in relation to the "portion" of the children. *Held,* that there was a partial intestacy, and that the property, subject to the estate given to the widow, vested at the testator's death in his children, each child taking an equal share in remainder, to be enjoyed on the termination of the widow's estate, or sooner by the exercise of the power of making advancements.

2. SAME. *Same. Estate in remainder. Vested, when.* A testator devised certain land to his wife for life, and "at the death" of the wife, to his only surviving child for the joint and several lives of herself and her husband, "with remainder over" to his grand children then in being, and to the heirs and representatives of those grand children who may have died. *Held,* that the estate in remainder vested at the death of the testator's widow.

3. CODE. *Construction. Inheritance.* The Code, section 2420, undertakes to provide in what manner the land of an intestate owner shall be inherited by his lineal descendants, collateral kindred and ascendants, and makes sub-divisions which require to be construed together as parts of a common plan, and has used in its second sub-division the word "acquired," as including all lands which came to an intestate in any other way than "by gift, devise or descent'from a parent or the ancestor of a parent." The dictum in *Penniman* v. *Francisco,* 1 Heis., 511, to the contrary is incorrect.

4. WIFE'S VESTED ESTATE IN REMAINDER. *Personalty.* A wife's vested estate in remainder in personalty goes, upon her death, to her husband *jure mariti,* and, upon his death, to his personal representative for the benefit, after the payment of all debts, of the distributee under the statutes of distribution, and if the distributee be his only child, who dies without issue, brother or sister or their issue, or parent, leaving as its next of kin a maternal grandfather, and paternal or maternal uncles and aunts, the maternal grandfather would be the distributee of such personalty.

Wills of John D. and Joseph Miller.

5. STATUTES OF DISTRIBUTION. *Intestacy without issue, brother or sister or their issue.* An intestate died without issue, brother or sister or their issue, or parent, leaving a maternal grandfather and paternal uncles and aunts surviving, and having land inherited from the intestate's father, and land inherited from the intestate's half-brother. *Held,* that the land which came to the intestate by descent from the father would go, under the Code, section 2420, sub-section 3, to the paternal uncles and aunts exclusively, and the land inherited from the half-brother would go, under the Code, section 2420, sub-section 2, one moiety to the paternal uncles and aunts, and the other moiety to the maternal uncles and aunts, and that two aunts who were equally related to the father and mother, would take severally a share in each moiety.

FROM SUMNER.

Appeal from the Chancery Court at Gallatin. H. H. LURTON, Ch.

LEE HEAD, B. F. ALLEN, J. J. TURNER, JORDAN STOKES, and MUNDY & ELKIN, of Counsel.

COOPER, J., delivered the opinion of the Court.

In this agreed case, the rights of the parties turn upon a construction of the will of John M. Miller and Joseph Miller, and as to some of the parties on the construction of our statutes of descent.

John M. Miller, who was a son of Joseph Miller, died on the 29th day of August, 1850, leaving a widow who is still living without ever having married again, and five children, Susan Miller being one of them. On the 14th day of June, 1865, Susan Miller intermarried with her cousin Archie W. Miller, had one child by him named John M. Miller, and died intestate on the 2d of August, 1866. The child John M. died the following month, his father, Archie W. Miller,

and his half sister Dora Miller, a child of the father by a former marriage, surviving. The father died on the 9th of February, 1873, and Dora died in the month of October in the same year, both intestate.

There were living at Dora's death, her maternal grandfather James Alexander, her maternal uncle Charles S. Alexander, three uncles on her father's side, Thomas Miller, Joseph Miller and R. G. Miller, and two aunts, Susan Lockey and Jennie Donelson on the side of both father and mother, being equally related to each.

By his will, John W. Miller, after providing in the first clause of his will for the payment of his debts and funeral expenses, expresses his wishes thus:

"Second. I give to my beloved wife Mary Ann Miller, all of my estate, real and personal, during her widowhood or natural life; should she never marry, to hold the same to help her school and raise the children, till said children come to the age of twenty-one, or leave her. She may give them their portion, or so much as may be agreed by her and my executors; and should she marry, then to take the course the law has laid down."

"Third. I do hereby appoint my father Joseph Miller, my beloved wife Mary Ann Miller, and Andrew K. Miller my executors, with power to sell any of my property, real and personal, and to make any trade of any kind that they may think will be for the comfort and interest of my beloved wife and children."

If his widow should marry again, the testator's will is that her interest in his estate should be cut down

to what the law would give her had he made no testamentary disposition, namely, dower in the realty, and a child's part in the personalty. *Hughes* v. *Boyd*, 2 Sneed, 512; *Duncan* v. *Phillips*, 3 Head, 415. If, however, she remained a widow, the whole estate, real and personal, was given to her for life, with power to advance to the children " their portion," as might be agreed upon between her and the executors. No point is made in the agreed case upon the exercise of this power. The third clause of the will merely clothes the executors with a discretionary trust to sell or make any trade in relation to the property devised, if necessary " for the comfort and interest " of the wife and children. The agreed case does not show any exercise of this power, and it obviously contemplates only a change of form, not an interference with the vested rights of wife or children.

The power given to the widow to advance to the children " their portion," or so much thereof as may be agreed upon, recognizes the fact that the children have a fixed portion of the property vested in each child. This must be either by the will or by the law. The will itself is otherwise silent on the subject, and the conclusion of the Chancellor seems to be irresistible, that the decedent died intestate as to the remainder, and that each child became, at his death, vested by law with one undivided one-fifth share of the property in remainder, to be enjoyed upon the termination of the estate given to the widow by the will, or sooner by the exercise of the power of advancement.

In this view, upon the death of Susan Miller, one

of the children of John M. Miller, on the 2d of August, 1866, the widow still living, her vested interest in remainder in the personalty of her father's estate passed to her husband Archie W. Miller, *jure mariti*, and, upon his death, to his personal representative. *Tune* v. *Cooper*, 4 Sneed, 295. No question has been made about this personalty, and perhaps there is none. If there be, Archie W. Miller's daughter was his next of kin when he died, and the father's personal representative would recover it for the benefit of her personal representative, and the latter, in the events which have happened, would distribute it to her next of kin, her maternal grandfather, James Alexander. Code, section 2429, sub-sec. 7; *Lattimer* v. *Rodgers*, 3 Head, 692.

Susan Miller's vested interest in remainder in her father's real estate descended, on his death, to her son John M. Miller. Code, section 2420, sub-sec. 1. Upon his death, it passed to his half sister, Dora Miller. Although the link in the chain of descent has been generally conceded, and the struggle has been over the point as to who is the heir of Dora, yet the examination of our statutes of descent must commence here in order to enable us to take the next step. For, when we look at the mere letter of the act, no express provision for a brother or sister of the half blood is made, except in the second sub-section of section 2420, which provides for the descent of estates "acquired" by the intestate, and it is precisely upon the meaning of this word that much of the argument submitted has been made to turn. The same absence of express

provisions in the statute for a surviving parent, where the parent representing the line of transmission is dead, is noticed by Judge Sneed in *Towls* v. *Rains*, 2 Heis., 359.

The Code, it must be borne in mind, as was held by this court immediately after its adoption and has been repeated at this term, is a compilation of the existing laws. " In doubtful cases, it will be presumed, that it was not intended to change, but only to revise or compile the old statutes." *Bates* v. *Sullivan*, 3 Head, 632; *Tennessee Hospital* v. *Fuqua*, 1 Lea, 611. Moreover, the Code plainly tells us that the intention was to cover the whole law of descents. The section which gives rise to the litigation, commences thus: " The lands of an intestate owner shall be inherited in the following manner by his lineal descendants, collateral kindred, or ascendants." It is claimed that the revisers and the Legislature supposed that the whole of the existing law was brought forward, and that they intended to leave no case unprovided for. Of course, they may have been mistaken, but it would be very curious if the omission had escaped the scrutiny of the profession for twenty years.

The article of the Code on the subject of descents was originally prepared, as the writer of this opinion knows, by Mr. Meigs, whose analysis of the laws of descent as shaped by our decisions had previously been embodied in his digest. The whole draft of the article was re-cast in the legislative committee by the same eminent Reviser, with the active aid and supervision of the chairman of the committee, the Hon.

Joseph B. Heiskell, who has recently retired from the office of Attorney General and Reporter for the State. I had myself, as one of the Revisers of the Code, drawn up the statutes in a different form, but I acquiesced in the revision as adopted. While I know the intention of the draftsman, I concede that the intention must be determined, as in other cases, by the language actually used.

The Code, section 2420, divides the subject of descents, and makes provision for three classes of cases.

1st. Without reference to the source of the intestate's title.

2d. Where the estate was "acquired" by the intestate and he dies without issue.

3d. Where the land came to the intestate by gift, devise or descent from a parent or the ancestor of a parent, and he dies without issue.

It will be noticed that the last two divisions make no provision for the case where the intestate in either of these classes, dies leaving issue. Consequently, there is a *casus omissus* under both these divisions, unless we can look to the provisions of the first division to complete the descent. On the other hand, neither the first nor the third division provides expressly for the half blood of brothers and sisters, nor for the contingency of both parents surviving the intestate, and the plan of inheritance is incomplete unless we can supply the deficiencies by means of the details of the second division.

Looking closely to the provisions of the entire section, it will be seen that the first sub-division merely

says that an intestate's descendants, if there be any, shall in all cases inherit his lands, and so shall a surviving parent where there are no issue, nor brother and sister or their issue. So, the third sub-division only provides, in the case specified, that the brothers and sisters of the whole blood, and the parent, or his heirs, from whom or whose ancestors the land came, shall be preferred. All other contingencies are unprovided for, unless covered by the second sub-division. And this sub-division does exactly supplement the deficiencies of the other two. According to all the rules of statutory interpretation, these clauses would require to be read together, even if separated by sections or pages, for they are in *pari materia*. To consider each paragraph as having no connection merely because numbered consecutively, although parts of only one section and preceded by a delaration that they cover the whole field of descent, would be utterly without reason. Obviously, the first and third sections were intended for particular contingencies, and the second section to provide for every other supposable case. The word "acquired" was used in the broad sense, so as to cover lands which might come to the intestate in any other way than "by gift, devise or descent from a parent or the ancestor of a parent." The case of *Penniman* v. *Francisco*, 1 Heis., 511, was correctly decided, the facts bringing it clearly within the first sub-division of section 2420 of the Code. But if the father of the intestate had been dead, there would have been no provision for the further descent of the property in that case except under the second

sub-division. The suggestions of the Chief Justice that the intestate did not "acquire" the title within the section, because she inherited it from her grand uncle, was *obiter*, not necessary to the decision, and in the light of a more critical examination upon a state of facts requiring it, incorrect.

The land in controversy did not come to Dora Miller "by gift, devise or descent from a parent or the ancestor of a parent," but was "acquired" by inheritance from her half brother. Upon her death without issue, brothers or sisters or their issue, or parents, it descended, under the provisions of the second sub-division of section 2420, to the heirs of the father and mother in equal degree, there being such heirs, in "equal moieties." It is agreed that the word "moieties" in this connection means shares, and that the paternal and maternal uncles and aunts of Dora take equal shares. But the preceding paragraph of the sub-division provides that if the parents be living, they shall take the land as tenants in common, that is, in equal moieties. If either parent be dead, the surviving parent would take under the first sub-division. If both be dead, the law contemplates that the heirs of both shall take precisely as if each had taken when alive, and then died. The paternal uncles and aunts will take one moiety of the land in equal shares, and the maternal uncle and aunts will take the other moiety in equal shares. The result will be to give to the two aunts, who were equally related to the intestate, on both the father and the mother's side, a share in each moiety. This is in accordance with the

decree of the Chancellor, and the same will be affirmed, so far as the descent of this land is concerned.

Joseph Miller, the father of the preceding testator John W. Miller, died on the 13th of November, 1858. By the third item of his will, he gave the other land in controversy in this case to his wife, Susanah Miller, for and during her natural life. The next item of the will reads thus: "Item 4th. At the death of my wife Susanah, I give and devise to my only surviving child, Nancy Jane Alexander, wife of James Alexander, all the balance of my home tract of land, etc., for and during the joint and several lives of the said Nancy Jane and her husband, James Alexander, with remainder over to my grand children then in being, and to the heirs and representatives of those grand children who may have died."

Susanah Miller, the widow of the testator, died on the 1st of November, 1863. Nancy Jane Alexander, the testator's daughter, died on the 28th of March, 1870. James Alexander, the husband of Nancy Jane, is still living. At the death of the testator, he had fourteen grand children, Archie W. Miller and Susan Miller who intermarried as before mentioned being two of them, and all of these grand children were also living at the death of Susanah, the testator's widow. There has been no increase in the number of grand children since the testator's death, and only two of them have died, namely, Archie W. Miller and Susan his wife, as hereinbefore stated. The rights of the parties turn primarily on the construction of Joseph Miller's will.

Omitting useless words, and reducing the 4th clause of the will to its simplest elements, the testator says: " At the death of my wife, I give my home tract of land to my only surviving daughter for the lives of herself and husband," " with remainder over to my grand children then in being, and the heirs and representatives of those who may have died." The mention of the " lives " of the daughter and husband, is for the purpose of defining the quantum of the daughter's estate, and not to designate a point of time to which the words " then in being " may relate. The testator does not say that the remainder shall go to the grand children, etc., in being at the death of the daughter, or at the death of the son-in-law, or at the expiration of the estate given the daughter. If we fix upon either one of these dates, it would be merely by implying the intent, not because the intention is distinctly expressed. Nor is there anything in the will, or in the situation of the testator's family at the date of the will, or in the events which have happened, to require such an implication. On the other hand, the language used admits grammatically as well as naturally, of a construction which allows the word " then " its usual meaning, and gives it a point of time to which it may fairly refer. I give, says the testator, certain lands to my wife for life, and, " at the death of my wife, "I give the same land to my only daughter for two " lives," " with remainder to my grand children *then* in being," etc. The estate of the daughter and of the grand children is to vest at the same point of time,—the one in possession and the other in remain-

der, and that time,—the death of the wife. This is the plain meaning of the words without refining upon them, drawing inferences more or less remote, or resorting to the presumptions of law in favor of the vesting of estates at the earliest point of time.

In this view, the share of Archie W. Miller in his grandfather's estate, vested in him at the death of the testator's wife, and, at his death, descended to his daughter Dora, and, on her death, to her three paternal and two maternal aunts equally, under the Code, section 2420, sub-section 3. The share of Susan Miller in her grandfather's estate vested in like manner at the death of the testator's wife, and descended, on her death, to her son John M. Miller, and, on his death to his half sister Dora, and, on her death, under the Code, section 2420, sub-section 2, as did Susan Miller's share in her father's realty, in equal moieties to the heirs of the said Dora's father and mother, the two aunts taking a share in each moiety.

The degree of the Chancellor, with the modification touching the personalty of the estate of John M. Miller, if any, is affirmed.

TURNEY, J., delivered a dissenting opinion.

Joseph Miller died on the 13th November, 1858, leaving a will. By the fourth clause, he devises, "At the death of my wife Susanah, I give and devise to my only surviving child, Nancy Jane Alexander, wife of James Alexander, all the balance of home tract not hereinafter devised to Joseph K. Miller, and, also, all the interest which I have purchased of the heirs

of Woods S. Miller in the tract of land whereon the said James Alexander now resides, for and during the joint and several lives of the said Nancy Jane and her husband, James Alexander, with remainder over to my grandchildren then in being, and to the heirs and representatives of those grand children who may have died."

Susanah, the wife of Joseph Miller, died November 1, 1863. Nancy Jane Alexander died 28th March, 1870, her husband surviving her and still living. Archie W. Miller, a son of Nancy Jane by a former marriage, intermarried with a daughter of James Alexander, viz: Martha, who gave birth to one child, Dora, and died. Archie afterwards married Susan Miller, a grand daughter of Joseph, and who gave birth to one child, John M., and died 21st August, 1866. Her child, John M., died in September, 1866. Archie W. Miller died in February, 1873, and Dora died in October, 1873.

The questions for adjudication are:

1st. Did the granddaughter, Susan, and the grandson, Archie, take or acquire any interest under the will of their grandfather, Joseph Miller, in the lands devised, or upon whom did it devolve?

2d. Did the infants, Dora and John M., take or acquire any interest, etc.?

We have seen the devise is, to Nancy J. Alexander during the joint and several lives of herself and husband, with remainder over to grandchildren *then in being*, and to the *heirs of those grandchildren who may have died*. It is clear the adverb "then" has refer-

ence to the falling in of the particular estate. It is
used as a continuation of the sentence, and interprets
the whole to mean, that immediately upon the ter-
mination of the estate devised for the two lives, a
right or title is to vest in such as may answer the
description of grandchildren and the heirs of grand-
children, on the happening of that event. The mean-
ing of the testator evidently was, that immediately after
or upon the termination of the particular estate, those
answering the description should take the fee. This
interpretation is made the more manifest by the use
of the verb "may have died," which necessarily em-
braces any death occurring between the death of the
testator and the ending of the estate of Mrs. Alexan-
der, now dependent upon the life of her husband, James
Alexander. The term "then in being," applies as well
and as strongly to the heirs and representatives of
deceased grandchildren, as to grandchildren. It was
not the intention to vest an interest in any grandchild
or its heirs or representatives, until the happening of
the designated event, at which time, those answering
the description of those to take the remainder, will be
vested with interests, grandchildren and their children
antecedently dying, not being objects of the gift.

Leaving out the language of the devise, "and to
the heirs of those grandchildren who may have died,"
this case is precisely, in principle, as *Satterfield* v. *Mays*,
11 Hum., 59, in which Judge McKinney says: "The
rule is well settled, that when a bequest is made to
a class of persons subject to fluctuation by increase or
diminution of its number in consequence of future births

or deaths; and the time of payment or distribution of the fund is fixed at a subsequent period, or on the happening of a future event, the entire interests, vest in such persons only, as at that time fall within the description of persons constituting such class. As, if property be given to the children, or to the brothers or sisters of A., equally to be divided between them, the entire subject of gift will vest in any one child, brother or sister, or any larger nnmber of these objects surviving at the period for distribution, without regard to previous deaths. Members of the class antecedently dying are not actual objects of the gift."

In that case, a bequest of a slave was made to Elizabeth Mays for life, *with remainder to* her daughter.

If Joseph Miller had, as already suggested, left off the words "and to the heirs," etc., Satterfield's case would be conclusive of this.

We can see no reason why, if the rule would obtain them, the testator may not enlarge the circle of the objects of his bounty and include the heirs of such grandchildren as may have died before the estate in remainder arises.

It is urged, however, that the devise being to Mrs. Alexander, etc., "with remainder over," etc., the particular estate and remainder vest at one and the same instant, but is upon the death of Susanah. This position is also met by the Satterfield case, for there, as we have seen, the language "with remainder," is employed by the will, and yet it was holden that no estate vested in the remaindermen, until the death of the owner of the life estate, and was

confined to those suiting the description of daughters at her death, those daughters pre-deceasing their mother being entitled to none of the benefits of the bequest.

If, however, the bequest had been *with remainder to the daughters, and to the heirs of those who may have died,* would it, or could it be insisted that the rule would thereby be changed? Would the additional words have contracted the time at which the gift would vest? We certainly think not.

Chancellor Kent defines a remainder, to be a remnant of an estate in land, depending upon a particular prior estate created at the same time and by the same instrument, and *limited to arise immediately on the determination of that estate,* and not in abridgement of it.

This sustains the reasoning and conclusions in *Satterfield* v. *Mays.*

Taking the definition of a remainder as given by Kent, and also by Coke and Blackstone, what is carried by the latter clause of the devise in question, we can find but one answer, viz: An estate depending upon the prior particular estate of Mrs. Alexander; and to arise immediately upon the determination of that estate, which is now dependent upon the life of James Alexander.

Recurring to the language of the clause in question. We find it stronger and more expressive in its terms than that in the Satterfield case. In this will are the words "remainder *over* to," etc. In the Satterfield case, the language is, "with remainder to." Now as it is a rule of law in the interpretation of wills, that the construction must follow the intention

of the testator, we must, to arrive at such intention, give effect to every word (if possible) employed by the testator. Standard Lexicographers, amongst other definitions of the word "over," give it the meaning of "from one to another by passing," so that giving each word its import, and thereby construing the contested part of the clause, we must make it read so as to give the particular estate to Mrs. Alexander, and after a passing from her, an estate in fee to her grandchildren then in being, etc., and vesting in the latter at the time of the passing out of the prior particular estate.

It cannot, in our opinion, be ascertained who are the heirs or representatives of Archie W., or Susan Miller, or any of the grandchildren of Joseph Miller, as contemplated by the will, until the death of James Alexander, at which time, each grandchild surviving will take one 14th, and the heirs and representatives of those who may have died, the interest his, her or their ancestor would have taken, if living, which is also one 14th part of the estate devised.

The purchase of the estate of Mrs. Alexander, gives to the purchaser a right to the use and enjoyment of the land during the life of Alexander.

The sale of the entire estate by the grandchildren now living, was, in our opinion, premature, unauthorized and void, and vests no title in the purchaser.

The decree of the Chancellor, we think, should be reversed as to the will of Joseph Miller, and affirmed as to that of his son, John M.

Judge DEADERICK concurred in this opinion.